## YONGE *vs.* KINNEY.

| 28 | 111 |
| 117 | 109 |

1 Parol evidence is admissible to show it a rule of the Western and Atlantic Railroad, that persons are not to be on the platform when the cars are in motion.

2 A Railroad car running off the track, is *prima facie* evidence of negligence in some of the persons connected with the road.

3 If the person who is injured by the cars running off the track is himself culpable, the damages, if any, should not be as large as if he had been free from fault.

Case, from Cass county. Tried before Judge Trippe, at September Term, 1858.

This was action on the case brought by Martha Kinney, against the Superintendent of the Western and Atlantic Railroad, to recover damages for the killing of her son, John Choice Kinney, a minor, while a passenger on the cars of said road.

The jury found for the plaintiff three thousand nine hundred and sixteen dollars and sixty-two and two-third cents.

Whereupon the defendant moved for a new trial, which the court refused, and defendant excepted.

The facts of the case and the grounds of the motion for a new trial, are sufficiently stated in the opinion of the court.

D. A. WALKER, for plaintiff in error.

SHROPSHIRE and UNDERWOOD, *contra.*

*By the Court.*—BENNING, J., delivering the opinion.

Was the court right in overruling the motion for a new trial?

Yonge vs. Kinney.

The first ground of the motion was as follows : "Because the court erred in ruling out the answer of John B. Fulton, to the following interrogatory : 'was there any rule relative to persons remaining on the inside of the cars, or on the platform, while the cars were in motion ; and if so, what was it ?" said answer to which, and which was withheld from the jury, being in these words : "there was a rule forbidding all persons from being on the platform, when the cars were in motion.' "

The ground on which the exclusion of this evidence was put, as we infer from the argument, was, that if such a rule existed, there was better evidence of it, viz : written evidence of it in the "order books" of the Road. And what was relied on in support of the ground, was the 7th section of the act of 1850, "to provide for the collection and safe keeping of the revenues" of the road, "to punish those who" might "attempt to defraud the same, and for other purposes." (Cobb, 419) That section is as follows :

"The Governor and chief engineer be and they are hereby authorized and empowered, to adopt such rules and regulations for the government and management of said road, as they may deem conducive to the public interest, not inconsistent with the constitution and laws of this State, which shall be recorded from time to time, as they are adopted, in one or more order books to be kept for that purpose." Does this section sustain the ground? Does it show that the rule, if it existed, must have been on record in some "order book or book" of the road ?

We think that it does not, and for two reasons. First, although the section says, that the "rules" which the Governor and chief engineer may adopt, shall be recorded in an order book or books, it does not say, that they must adopt any rules. It goes no further than to authorize them to adopt rules. And it might well be, that the rule in question existed at the date of the act, and that the

governor and chief engineer never adopted it, but left it as it was. In that case, it would be a good rule, even though not of record in any order book.

Secondly, we must doubt whether the intention was that the section should extend to rules of this kind; whether the intention was that the section should extend to any other rules than rules to operate on the officers, the agents and the employees of the road.

1st. We think, then, that the court · erred in not receiving the answer to the question.

The second, the third, the fourth and the seventh grounds, may be passed without further notice than this mention of them. They merely impute error to the jury, in finding against the evidence, or against certain charges of the court; and, it is needless to consider them, as a new trial is to be granted on other grounds.

We see nothing meritorious in the fifth ground. The qualification added by the Court to the charge requested, was obviously proper.

The sixth ground was this charge: "that the running off of the track, by the train, was *prima facie* evidence of negligence on the part of the officers of the road."

We are not prepared to say that this charge was wrong.

2. It is certainly true, that in a large number of the cases in which a train or car runs off the track, there is no negligence in any of the persons connected with the road; but it is also true, as we think, that in a still larger number of the cases there is negligence in some of the persons connected with the road; and the chances are greater, that any particular case shall belong to the majority, than to the minority. Consequently, when there happens the case of a car running off the track, and nothing but such running off appears, the presumption must be that negligence in some person or persons connected with the road, was the cause why the car ran off. But this presumption will be a slight one, and easily rebutted;

8

the cases being in so large proportion, which are free from negligence.

The eighth ground was this charge: "that though the deceased may have been guilty of some negligence, this does not excuse the road, if they," [the jury] "believe, the officers were greatly more at fault than deceased."

We doubt whether this charge is precisely right. See Davis vs. Western and Atlantic Railroad, 18 Ga. 679. Western and Atlantic Railroad vs. Wynn, 19 Ga. 440. And for my own opinion as to the rule, see Western and Atlantic Railroad vs. Wynn, decided at Macon, June, 1858.

The ninth ground was the charge: "that if the road would not bear a speed of thirty miles an hour, the speed should have been lessened so as to make it safe"—it being insisted, that there was no evidence to authorize the charge. And we can find none. Therefore, we must hold the ground a good one.

The tenth ground was, that the damages were excessive.

The damages were assessed at $3,916 66. The suit was brought by the mother to recover the value of the services of her minor son. If he had lived, she would have been entitled to his services, so long as he remained a minor, and no longer. Obviously, then, his age at the time of his death, and the annual value of his services, are important elements in the question of what was the proper amount for the damages. What says the evidence on these two points!

There are two witnesses on the points, Montfort and Dunlap. Montfort says that the minor, when killed, was from sixteen to eighteen years old; and that his services were worth from $25 to $30 per month, and that their value would have increased at from ten to twenty-five, or fifty per cent. It is quite obvious, that we cannot get damages to the amount of $3,916 66 out of this evidence.

Dunlap says that he moved to Cassville, on the 15th of January, 1839, and that about that time he became ac-

Yonge vs. Kinney.

quainted with the minor; that from the age of his own son, and from conversations with the minor's mother, he thinks that the minor was about sixteen; that the minor was going to school when he first knew him. If he was, he must have been, we may assume, at least five years old. That was in 1839. So, we may conclude that he must have been born some time in 1834. He was killed in December, 1851. Consequently, he must at that time, according to this evidence, have been in his eighteenth year. The witness also says, that in 1845 he engaged the minor as an attendant about his store, at $5 per month. It is very unlikely that such an engagement would have taken place before the minor had arrived at the age of eleven or twelve years. This, then, corroborates the other part of the witness's testimony. We may say, therefore, that according to the testimony of this witness, the minor was, when killed, at least seventeen years old.

This witness says that the minor's services were worth $30 per month, or $750 per year, (he had been drinking;) he also says, that a first rate clerk was worth $1,000 per year, and that the minor was as good a clerk as he ever saw.

The incongruity in all this makes it worth very little as evidence. But say that it is trustworthy, and is to be construed most favorably for the verdict, what will be the result? Thirty dollars per month—even seven hundred and fifty dollars per year, will not, in four years, amount to $3,916 66. But $1,000 a year, for four years, will, and to something more. Say, then, that by the testimony of this witness the services of the minor were worth $4,000, does it follow that the damages ought to be for that amount, or even for an amount equal to the verdict? It does, perhaps, unless there were some items to be set against the services. Were there any such items? We think that there were several. One—the expense of subsisting the minor. It is to be presumed that the witness

Yonge vs. Kinney.

when he impliedly said that the minor was worth $1,000 per year as a clerk, did not mean to say, he was worth this sum clear of the expense of his support. That expense would plainly be a considerable item.

Two—the chances of the minor's dying before arriving at the age of twenty-one. There is a way of estimating such chances. The insurance officers do it every day. How much these chances ought to reduce the damages, I am not prepared to say. I am sure, however, that they ought to reduce it quite appreciably.

Three—the fact that the minor was himself greatly to blame in the affair. He was an employee of the road. It is to be presumed, therefore, that he well knew that the platform on which he was, when killed, was a place of extra danger. In addition to this, he was told by the conductor that the place was one of danger, that he was violating a rule of the road, and that he must come inside the car. This he disregarded, and was killed; whilst another young man, who was with him, heeded it, went inside the car, and escaped unhurt. Ought he, or those standing in his right, under such circumstances, to recover full damages—to recover as much as if he had been guilty of no negligence himself? We think not. We will not undertake to say how much such conduct as this ought to reduce the recovery, but we will say that it ought to reduce it much.

It was, however, insisted that the mother was not to suffer for this misconduct of her minor child. The case was likened to that in which a man's slave is improperly taken on board a train, and is killed by it, through his own fault. But we do not see the analogy. It is not to be presumed that this minor was improperly on the train —was on it without his mother's consent. He was, and had been for some time, living away from his mother, apparently pretty much his own man. From this, we should

be authorized to infer a general consent on her part, to his traveling on the railroad.

And, then, what is more important and decisive, is that the mother is entitled to assert only the rights which the minor himself might have asserted, if he had been alive, and were the party sueing for the injury. She is entitled to sue, as his "legal representative," and in no other way or right. And, as his legal representative, she is only entitled to sue if the circumstances are such that they would have entitled him to sue, had the injury stopped short of killing him. The nature of his conduct, then, enters as much into the case as if he himself were the party plaintiff. All this is is by the act of 1850. (Cobb, 476.)

The conclusion, then, to which we come, is, that the verdict was too large, and that therefore this tenth ground was well founded.

That is the last ground.

The result is that we think that the court ought to have granted the motion for a new trial.

New trial granted.